The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court and beyond here, give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Good morning. Please be seated. The Court is in session. Before we begin, I want to welcome Judge Valez-Rivet to the First Circuit. Thank you. And to thank her for sitting with us by designation. She joins us with many years of experience as both a magistrate judge and a district court judge in the District of Puerto Rico. Thank you for being here. Thank you for the invitation. My pleasure. Thank you, Judge. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 24-1209, United States v. Ariel Legassa. At this time, would counsel for the appellant please introduce themselves on the record to begin. Good morning, Your Honors. I'm the assistant court Leslie Koehler-Roper for Mr. Legassa. With the court's permission, I'd like to reserve two minutes for rebuttal. You may. Please move the microphone closer to you. Thank you. The issue raised, the first issue raised regarding the lay opinion testimony improperly admitted. I want to make a couple of points to be very clear about what this argument is and what it is not. The argument is that the defendant objected to the repeated unqualified testimony of Ray Gabald, the CFO of New England Sports News, about the conclusion that Mr. Legassa had committed fraud. So the first time this testimony came in, counsel missed it. And he very candidly told the court when it was brought up again, I should have objected the first time. I don't want them to repeat this again. So what happened was the government, having gotten away with having their lead witness testify, the defendant essentially was guilty of a fraud against his company, said, let's remind everyone again. Why did you stop the payment on the last two invoices, stop the payment of the checks on the last two invoices? Counsel at that point objected, explained that he should have objected before, said this is a legal conclusion that the witness is not qualified to pay. But the answer in that case was, I'm not going to send it to a fraudulent company. Okay. I mean, I'm not sure that's any kind of conclusion about anything. If it was, I'm not going to send it to a not a real company. I mean, it doesn't seem like there was much dispute this wasn't a real company. Whether you call it fraudulent, not real, fake, what does that mean? Well, first of all, that wasn't the next answer he gave. This went on for quite a long time. And the court indulged the court. What was the next answer he gave? The next answer he gave was, it had come to my attention that those payments, I'm sorry, those payments were being made to a fraudulent company. He did say that. But 701 requires that the opinion be based on the personal knowledge of the witness. Well, he's not testifying to the truth. He said, why did you make a decision? Here's why I made the decision. This was a fake, fraudulent, not real company. That's my understanding. That's why I took the actions I did. You could have asked for a limiting instruction that that's not for the truth of the matter asserted. I think you should have gotten that if you wanted it. Because that's not why it's being introduced. It's to explain his actions. But it's not going to the overall question of did Mr. Lagassa commit fraud. The problem is, this was not the right witness to give this testimony. If anybody could have given it, it would have been the CEO of Alley, New York, Bradford Campolurian. He's the one who discovered that Alley, Connecticut. But did Mr. Gubalt choose not to make payments at the end? No, he didn't. He chose not to, right? Invoices were before him. He didn't write the checks or sign the checks. Mr. Gubalt chose not to in December of 2021. But at that time, all he says, every time he's asked, and this question went on and on and on, it came to my attention. It came to my attention. And he was actually asked a much more direct question that was close to being proper. And the question was, what was it about these invoices that caused you to stop payment? Now, it's a little bit leading. It leads the witness to say there was something about the invoices. But, in fact, the witness didn't even answer anything about the invoices. He just said it had come to my attention there was a problem with these invoices. So I think the most logical conclusion, looking at the record as a whole, is that Mr. Tempolurion. If anything, isn't that just a hearsay problem, if that's any problem at all? It is a hearsay problem. But it's the government gets to take their lead witness, who in some ways, though he's not law enforcement, is similar to an overview witness, right? He's giving all his testimony of the structure of the company and how they do their deals and Mr. Lagasse's employment and the history of this and that. And he's, you know, he's a CFO of a big company that everybody knows and thinks pretty highly of. Even if it's error, how do you get around the harmlessness argument? What I get around it with is that the government's witnesses, notably Mr. Goebbels himself, were very much lacking in credibility in their testimony about what was going on with Mr. Lagasse's employment. Mr. Goebbels had to be dragged through the exhibits, including his own emails, to acknowledge, oh, yes, there was a big problem. Lagasse was upset. He wasn't happy with the conditions of his work. He wanted to leave and we could not lose him. We lost three VPs around that time. We couldn't afford to lose him. We would have been set back two years. He was asked, you know, isn't it true that Lagasse accomplished all these things and without him you couldn't have done it? No, no, no. And then when he was confronted with that, he said, well, that's what the email says. Counsel says, well, are you the author of the email? Yes, that's what I said. He didn't want to admit it. Why? Well, one explanation would be Mr. Lagasse's defense, that this was an agreement reached by the top C-level executives and Mr. Lagasse. While unusual, it's not inconsistent with Mr. Goebbels' testimony about what was going on, that they had to keep Mr. Lagasse and Mr. Lagasse was dissatisfied. In addition, I would draw your attention to the checks that Mr. Gilbalt and also the CEO both had to okay and both had to sign. It's on page nine of my brief. Now, the government made a trial emphasizing that anything under $50,000, Mr. Lagasse could approve it all by himself. There was no sign-off necessary. But anything over that, there was a sign-off necessary. And the very first two checks, three checks, actually four checks on this list were for well over $50,000. And Mr. Gilbalt just testified, well, I was relying on Mr. Lagasse. He's the vice president of operations. No. This whole system, this FISADEC system or FIDESEC system was set up so that above a certain amount. So does that get to the, if that's important evidence, is that because the defense was this was an arrangement that I had with these other people? And if I really was defrauding them, I would have kept it below $50,000 because I wouldn't have to expose myself to them? There's that. But there's also I submitted, the invoices were all submitted. They could see the invoices if they looked. And for, you know, the CFO to say I never looked at any invoices because I was just relying on the head of digital operations doesn't make any sense. Why doesn't that make sense? I mean, it seems to me that, I don't know, I have to sign a lot of things. Some I look at carefully, some I don't. It might depend on who gives them to me and how carefully I look at them. Yes, but his testimony was, I only look carefully at it when it's out of whack with what the contract is. And these payments were all totally out of whack. The first three or four payments were well out of bounds of the first statement of work. They were well over what was contemplated. $75,000 total, and here they're getting $110,000, $135,000. And if you looked at the invoice, it said Connecticut on it. One of them said Connecticut in handwriting, and one of them said nothing, had no address. So it's a little bit hard to believe that somebody who could reach that level of authority in a big company like that would absolutely look at nothing. And if that wasn't bad enough, on one day, and this was not brought at a trial, but I saw it looking at the exhibits, June 15, 2021, they approved two different checks, one for $85,000 and one for $50,000. So these people were signing checks in batches. Those checks would have been together. They would have seen, why are there two different checks in this company? Something would have raised their eyebrows and caused them to look at it if they weren't already aware of what was going on. And the defense is they were. They were already aware of what was going on. And that's why this testimony as well, Mr. Gilball's testimony that he made this decision because he suddenly found out something was funky with this company. But it seems like that just all goes to how this would play out in the end. Of course, everyone listening to that trial is going to know Gilball's going to say that, especially when he says, of course, I wouldn't do this scheme. It's illegal. So, I mean, it really comes down to the question in the end for the jury would be, that's, of course, what that guy said, because he's part of it. And he's now here in court. He's disassociating from it. And then the other side is going to say, that's not true. This was just a fraud on the company. And that's really the question for the jury. But I don't really see how, oh, Mr. Gilball says it's fraud would have this real impact on the jury, because you'd expect that given the defense. Like, what's he going to say? Oh, yes, I was in the scheme. Well, that testimony, I wouldn't do it because it's illegal. The because it's illegal was stricken. So it just comes down to him saying, I would never do that. But he doesn't explain how incomprehensible his decisions to approve. I mean, you don't need to be a dean to figure out, like, you shouldn't do that, right? I think all kinds of things happen in business. Your time is up. You'll have time on rebuttal. Thank you, counsel. At this time, would counsel for the government please introduce yourself on the record to begin. Good morning. May it please the court. Alexia DiMincentis on behalf of the United States. To some of the questions poised by Judge Afram here, as Your Honor pointed out, this testimony here from Gilball that this was a fraudulent company was not in any way getting to the ultimate question of whether or not LaGossa committed fraud. He was simply using that as shorthand for the fact that these payments were being made to a company that was not a legitimate vendor. On the personal knowledge objection, note that that was never raised below, so it's on plain air. There isn't any ambiguity as to whether or not this witness. Is that even raised in the brief? Excuse me? Is the hearsay point even raised in the brief or lack of personal knowledge or whatever? There is a lack of personal knowledge argument asserted briefly in the brief. But, again, where the defendant didn't object below, he can't benefit on plain air review from any ambiguity in the testimony. And I would also add that this was the CFO of the company talking. He is the person who approved payments, who ordered the stop checks here. So I don't, frankly, understand what the basis for a lack of personal knowledge objection would have been. Since we're on preservation, what's your position on whether the challenge to the evidence of the credit card expenditures was properly preserved? You give the standard for a preserved challenge in your brief. So the objection below, I think, was initially an argument about privacy concerns, which is not the same argument that's being made on appeal. That said, there was, throughout the course as this evidence was coming in at trial, there was an objection that this was irrelevant and unnecessary given the other evidence of the expenditures that occurred here. So I think it's fair to say that it was likely preserved. The standard of review, frankly, doesn't matter for this claim or any other claim that the defendant is raising on appeal. I have a question about that aspect of it. Sure. So the defense here was they were in it with me. This was extra salary. That's what was going on. And so if that's the defense, then the idea that he had extra money coming in to buy things and do home improvement projects is very consistent with that defense. Like, usually it's my salary is this, and then on the side I'm getting all this money. And so, look, that shows consciousness of guilt, scheme, all those things. But given his defense, which was they're in it with me, I'm just getting bigger pay, what was the relevance of these credit card things? If you take a look at the defendant's opening statement and, again, in his closing statement, a big theme was the idea that the defendant had too much to lose. He wouldn't have engaged in fraud. He had too much to lose. The government was entitled to counter that by showing that, in fact, he had a lot to gain, as evidenced by the fact that throughout the period of time during which he was receiving these additional payments, his credit card purchases are going way up while balances stay the same. And meanwhile, loan balances are going way down. This goes to motive. This is classic evidence of motive in a fraud case, and the government was entitled to introduce it. Subject, of course, to the 403 concerns that I think the district court very carefully balanced here. The district court left open the possibility of excluding particular expenditures because of privacy concerns, excluded evidence related to the bar and alcohol purchases as unduly prejudicial, and then excluded evidence regarding car-related Amazon purchases as cumulative, and ultimately did not even admit the summary chart showing the various categories of credit card expenditures because the jury had already heard the relevant evidence. The district court has broad discretion in balancing probative value versus the potential for unfair prejudice, and I think very carefully conducted that balancing here and did not abuse its discretion in reaching the conclusion that it did. Just very briefly, I want to address a few of the points made by defense counsel regarding the harmlessness inquiry here. There is no reasonable reading of this record that leads to the conclusion that the jury convicted the defendant because Jabal used the word fraud or fraudulent or because of these credit card expenditures. The jury clearly convicted the defendant because the evidence here was absolutely overwhelming, and frankly, his defense was utterly implausible. Every single defense witness at trial testified that they believed – or, excuse me, Nesson witness at trial testified that they believed that these payments were being made to the company that they entered into an agreement with. The CEO, CFO, and payroll supervisor all testified that – But that's self-serving testimony in light of the defense, right? So, I mean, the idea I heard floated was if these guys are in it with him and the evidence of that is they are so sloppy that that shows that they're in it with him, then that all these other things were part of their sort of three-man scheme to get him money. Even defense counsel in his opening statement had to admit that this defense sounded implausible. Now, he went on to argue that in the context it wasn't, but the jury had every reason to conclude that, in fact, it was entirely implausible, particularly when – They had every right to – I have no doubt they had every right to believe that, but the question we're asking, we're assuming here there was a significant error, which I think is a big assumption, but if we did, then we're asking the question of, well, are we sure that that wouldn't have happened? And I guess what I'm wondering is why is that – why is the evidence he not cited to enough to be, you know, put it into play? Well, to be clear, it wasn't just Gibalt who was offering this testimony, that this is just not how we pay people. It was also the CEO and the payroll supervisor. These people testified that in their collective decades of experience at Nesson, never once had an employee been paid in this manner. There were normal payroll procedures. This was an established company. There were also normal procedures for increasing pay. The CEO had full authority to increase Lagasse's compensation, in fact, did increase his compensation rather significantly in September 2021, smack in the middle of this fraud scheme, and if they wanted to, they could have given him more. They declined to give him the additional $35,000 raise that he was requesting in September, but then they did go on in January 2021 or 2022 to hire another executive-level individual at a compensation package that was nearly double what Lagasse was making. Bottom line, if they wanted to pay him more, they could have. The idea that they were going to instead engage in this side deal made no sense. The jury rationally rejected it, and the evidence here is such that any error in the admission of any of this testimony we believe was absolutely harmless. But your view, your brief, I want to make sure, your view on what we'll call the ultimate issue, is that that did not happen. I mean, fraudulent company is not your position, that's not an ultimate issue? Correct, yes. The first statement was unobjected to, and do you think that was an ultimate issue, but it's not objected to, or what's your view on that first unobjected to statement? The first statement, we would agree, gets closer to the line of getting to the ultimate issue, and in an ideal world, that particular way of speaking wouldn't have happened. I think there's a natural tendency sometimes in fraud cases for witnesses to talk in this manner, but in an ideal world, that's not how things would have come out. And I think if you look at the next set of questions regarding those stop payments, you see what the government was ultimately trying to get out, which was this idea that he stopped the payments because this was not a legitimate offender. So your view on one is it failed at the third prong of plain error, is that your position? Correct, yes. And the second one you say is not an ultimate issue? Correct. And the final one you say was stricken? Was stricken. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce herself on the record? She has a two-minute rebuttal. Thank you. Leslie Feldman, real player again for Ariel Lagasa. First off, the government has not made an argument that the personal knowledge part of Rule 701 was waived. In fact, the government's brief on page 11, this is issue one, talks about standard review, CITES 701. They make an argument under the heading C, any errors in admitting the testimony was harmless, and then at the top of the next two pages later, after a very long paragraph, it just says in the middle of it, newly raised argument in statement two was not based on Galt's own perception. It was 701. The defense objection on this point was a reference to 701. He didn't have to say. Maybe it would have been easier to identify and be clear on it. Is it for the second statement? There's all of it. All of it. But the first statement, there's no objection at all? Correct. First statement, there's no objection. So what I heard them say is that's the one that was most erroneous, but you agree that would have to be reviewed under plain error, right? The reality is it's not just the answer that's objected to. It's the question. It's the question, why did you do this? Right, but there's no objection to any of it. The first time. But after that, there was. Right, but don't we have to take this question by question? I mean, this is a trial. We have a question. We have an objection. We have a question. Like, that's how it works, right? You do, but you also have to look at the role of the court in trying to make this a fair trial. So defense counsel acknowledges, I failed to make an objection that I should have made. I don't want them to do it again. This has been asked and answered, so why is the judge. That's completely preserved, right? That second one is completely preserved, and maybe there's a disagreement about whether that actually was an ultimate issue or not. Right. But I'm curious about the first one. That one, there's just nothing. It's a questions asked, answered, nobody says anything. That is correct. He missed it. Counsel's mistake. And that happens. Yep. And we have then a standard called plain error that if it's egregious enough, we can still correct. I'm not saying, I'm not putting my argument based on the first time. I'm saying it was error to allow the government to repeat that inappropriate question and to allow the answer said. Your time is done. Thank you. Thank you, counsel. That concludes our time. That concludes this argument.